# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDON LEE THOMAS (individually and as successor in interest for Michael Thomas),<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CASE NO. 3:19-cv-0100-CAB-LL<br><br>Court's Findings of Fact and Conclusions of Law Pursuant to Fed.R.Civ.P. 52(a) |

The following are this Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**I.     Introduction**

This is a Federal Tort Claims Act ("FTCA") case arising from the cancer-related death of Michael James Thomas ("Thomas") brought by his son, plaintiff Brandon Lee Thomas ("Plaintiff"). Thomas was in the care of the Veterans Affairs San Diego Health Care System ("VASDHS"). Nurse Practitioner ("NP") Andrea Bianco was his primary care provider. Plaintiff alleges that NP Bianco failed to use the level of skill, knowledge and care that a reasonably prudent nurse practitioner would have used in the treatment of a patient who presented with Thomas's history and complaints which delayed

diagnosis of Thomas's cancer and resulted in his premature death. Defendant, the United States, denies that NP Bianco's care of Thomas fell below the standard of care or that the alleged delay in diagnosis was the cause of his death.

Plaintiff, the only child of Thomas, brings a survival claim for medical negligence and a wrongful death claim for which he seeks damages. These two claims are brought pursuant to the FTCA, 28 U.S.C. §§ 1346(b)(1), 2674. It was undisputed that NP Bianco, at the relevant time, was an employee of the United States and was providing primary care to Thomas within the course and scope of her employment with the United States and therefore that the United States is the proper defendant in this action. A four-day bench trial was held starting November 9, 2020.

## II.    Issues Tried

1. Whether NP Bianco was medically negligent by failing to use the level of skill, knowledge, and care in diagnosis and treatment of Thomas that other reasonably careful primary care nurse practitioners would have used in the same or similar circumstances.
2. Whether the alleged breach in the standard of care was a substantial factor in causing Thomas to die prematurely.
3. Actual loss or damage resulting from the alleged medical negligence.
4. Damages relating to the loss of relationship between Plaintiff and Thomas.

## III.    Findings of Fact

Patient Thomas was born in 1954. Thomas was divorced and lived alone in San Diego for at least three decades up to his death in September 2017. His ex-wife and Plaintiff, his son, live in North Carolina. Thomas had not seen Plaintiff in over 20 years prior to the days preceding his death. They did however have infrequent telephone conversations over the years.

As a veteran, Thomas received medical care at the VASDHS. In 1999, Thomas had a stroke that left him with partial paralysis on his right side and slow, slurred speech. He lived on disability and used public transportation to get around. Until she passed in

January 2017, Thomas's mother who lived nearby in San Diego would assist him with transportation and shopping.  After she died, Joe Beatty, a friend of Thomas, occasionally assisted with transportation and grocery shopping and checked in on Thomas weekly.

Following his stroke Thomas was placed on the anticoagulation drug Warfarin which required regular monitoring at the VASDHS Anticoagulation Clinic ("Clinic"). He was also prescribed Atenolol for blood pressure management and Atrovastatin for cholesterol management.  Records provided at trial include Clinic notes reflecting that Thomas regularly attended the Clinic for his Warfarin monitoring, with the following exceptions.  In 2015 he was discharged from the Clinic for failure to show up for 3 or more consecutive appointments.  He was readmitted in July of 2015.  Then again on March 6, 2017 he was discharged from the Clinic for failure to show up for appointments since January 13, 2017 (following the death of his mother), despite having been counseled that it is dangerous to take Warfarin without proper monitoring. He was readmitted to the Clinic in late March, but again ceased going to the Clinic after July 28, 2017.

In the discharge letter he was sent on March 9, 2017, Thomas was advised to contact his primary care provider as soon as possible to get a referral to re-enter the Clinic for management and to continue to get his medication once his current prescription ran out.  Records indicate that his prescriptions for his blood pressure and cholesterol management medications had also expired. Thomas however did not contact Primary Care to obtain a referral to the Clinic or to renew his medications.

Thomas did arrive at VASDHS on March 23, 2017 due to a fall he had in his home on March 17, 2017.  Joe Beatty brought him to the VASDHS. Thomas was referred to the Emergency Department ("ED").  Thomas reported that a week earlier he slipped stepping from the shower and fell into the bathroom door frame resulting in

head injury with significant bleeding. The following day, he also noticed some tenderness and swelling on the right side of his neck.

Thomas was examined on March 23, 2017 by an ED internal medicine resident. Because Thomas was taking a blood thinner, a computerized tomography ("CT") scan was taken of his head to rule out any intracranial bleed and blood work was ordered. His complaint of right neck tenderness ("tenderness on right lateral trapezius muscle, most tender behind jaw") was examined and diagnosed by the resident physician as muscle strain related to the fall.

The physician also examined Thomas's oropharynx[1] noting it was pink with moist mucous membranes. He noted no irregularities or concerns related to the throat examination. He did however note that Thomas had poor dentition (i.e., the condition of his teeth was poor).

Thomas's weight was not measured on March 23, 2017. He made no complaints regarding weight loss, loss of appetite or decreased food consumption. He did not reference any difficulties eating or swallowing.

Having found the head wound healed, no irregularities in his CT or blood work, and his symptoms otherwise resolved, Thomas was discharged with a diagnosis of a muscle strain, given Tylenol and instructed to follow up with his primary care provider if any new symptoms appeared. The resident physician's findings were independently reviewed and approved by the ED attending physician. The resident physician also placed a referral to re-enter Thomas into the Anticoagulation Clinic.

It is also noted at the time of this ED visit that Thomas's contact information was not current -- his mother was still listed as his emergency contact, and it was requested that he update his contact information. It was also recommended that he obtain a Personal Emergency System/Life Alert and a consult was entered. He did not follow

---

[1] The oropharynx is the part of the throat at the back of the mouth behind the oral cavity, that includes the back third, or base, of the tongue, the soft palate, the side and back walls of the throat, and the tonsils.

through on these advisements which made subsequent efforts by VASDHS staff to contact him extremely difficult.

Thomas did not contact Primary Care with any complaints or request an appointment related to his March 23 visit to the ED. On April 14, 2017, Thomas went to the Clinic for his Warfarin monitoring. His anticoagulation level was elevated so the pharmacist Dr. Melissa Egan inquired about changes that might be affecting his dosage. He reported no changes or illness.

On May 5, 2017, Thomas returned to the Clinic and again his anticoagulation level was elevated. At that visit he reported that his appetite comes and goes, which Dr. Egan noted could be contributing to his high levels. Thomas made no report during these visits about neck or jaw pain, difficulty eating or concerns about his weight loss. The pharmacist decreased his dose of Warfarin and requested he return in one to two weeks for a monitoring check. Thomas however asked to schedule his recheck for three weeks, so it was set for May 26, 2017.

On May 26, 2017, Thomas returned. He had not decreased his dosage of Warfarin as directed and his anticoagulation level was still elevated. At this visit, Dr. Egan, who saw Thomas regularly at the Clinic, noticed for the first time that he looked visibly thinner and became concerned that his weight change might be interfering with his dosage levels. She weighed him noting his weight was down approximately 40 pounds from his last recorded weight taken in March 2016. Thomas reported difficulty eating due to a pain or lump in his right jaw.

The pharmacist requested Robyn Stein, a registered nurse in the Clinic, assess Thomas's complaint of right lower facial pain. Thomas reported the pain at his jawline to be 7-8/10 which made it difficult to eat. He did not report difficulty swallowing. Nurse Stein examined the right side of Thomas's face and found slight swelling that appeared to be more tightness in the area to touch. She did not feel a lump and noted that there was no redness.

Both nurse Stein and the pharmacist Dr. Egan were concern however about Thomas's report of current pain and his significant weight loss and strongly advised that he go to the ED that day as it was the quickest way for him to be further assessed. Thomas refused to go. Nurse Stein, unable to force Thomas to seek care, made some nutritional recommendations and scheduled a dual appointment for Thomas to return to the Clinic and go to Primary Care in three weeks on June 16, 2017, the first date that Thomas indicated he could return.

On June 16, 2017, Thomas was seen at the Primary Care. Based on the records provided at trial, the last time Thomas had been seen at the Primary Care was March 18, 2016, when he saw his primary care provider NP Bianco for an annual check-up. At that time Thomas reported he was feeling well and had no specific health related concerns.

Thomas was a heavy cigarette smoker, approximately a pack a day, since his youth. He was counseled about quitting in 2016 and provided smoking cessation resources within the VA, the local community and on-line, however he indicated no interest in quitting smoking. In March 2016 Thomas weighed 213 pounds, which at 69.5 inches placed him at a Body Mass Index ("BMI") of 31, which was noted as obese or high risk. Due to his history of stroke and hypertension he was counseled to reduce his weight and maintain a healthy diet to assist in lowering his blood pressure and cholesterol. The record also noted that Thomas was due for a colorectal cancer screening and he was given a FIT kit to provide a fecal sample. There is no indication he followed through on the screening. He was also instructed to return in one year for routine follow-up exam. In March 2017, Thomas had neither scheduled an annual visit nor at that time was he reporting to the Clinic for his essential Warfarin monitoring appointments.

On June 16, 2017, Thomas was first seen at Primary Care by a licensed vocational nurse ("LVN") for initial screening. Thomas reported to the LVN he was in no pain

that day. He reported that he was eating less due to difficulty eating but made no reference to any jaw or neck pain. Regarding other medical issues, the need for a colorectal cancer screening was still noted and Thomas refused the screening. He also again declined referral to the smoking cessation clinic and reported no interest in stopping smoking.

Thomas then saw NP Bianco. NP Bianco had reviewed Thomas's recent medical records and inquired about his present complaints. Thomas's weight was down approximately 45 pounds from his March 2016 exam. Although he had been encouraged to lose weight at his previous annual exam, and he appeared "well-nourished" at 167 pounds which placed him at a BMI of 24, considered healthy for his height, NP Bianco was concerned about the cause of his significant weight loss over the last 15 months.

In response to NP Bianco's inquiries regarding his general health, Thomas did not complain about the loss of weight. In response to her questions about any issues with his head and neck, he did not report any current pain or swelling or difficulty swallowing. He did report that he was having difficulty eating/chewing due to persistent sore gums and acknowledged he had not seen a dentist "in years."

NP Bianco did not observe any swelling or redness on Thomas's face and he did not report any concerns regarding his neck or jaw or with swallowing. Based on the patient's statements and her observations she did not conduct an examination of his neck or face for swelling, inspect his throat or order any diagnostic examinations of his neck or throat such as a CT scan, concluding none were indicated at that time.

Concerned however about Thomas's weight loss and relying on the patient's complaint of difficulty chewing due to sore gums, coupled with his history of poor dentition and lack of dental care, NP Bianco advised Thomas to schedule a dental appointment at his earliest convenience. She could not make a referral to a dentist as the VA does not provide that service. NP Bianco also ordered a nutrition consult, and

colorectal and prostate cancer screenings to investigate potential causes of his weight loss.

Thomas's blood pressure was also low on June 16. NP Bianco stopped his Atenolol medication and advised him to schedule a visit to the Primary Care Hypertension ("HTN") clinic in two to three weeks with the nurse to check his blood pressure.

NP Bianco advised Thomas to schedule a return visit in three months to follow-up on his weight loss and nutrition. He was provided time to ask questions, but there is no indication he asked about any health issues. Although he agreed with the plan of care, records indicate that Thomas did not follow through with a dental visit, declined the nutrition consult and did not provide specimens for the ordered cancer screenings.

Thomas was also provided with multiple means to access VA health care should he have questions or concerns. Thomas never contacted Primary Care after that date with any health concerns. Thomas left Primary Care on June 16, 2017 and NP Bianco did not see him again.

On July 7, 2017, Thomas presented at the Clinic for his Warfarin monitoring. His anticoagulation level was still elevated, but he told Dr. Egan he was eating okay. He reported that he had not yet seen a dentist, but he made no complaint of pain, swelling or difficulties swallowing.

On July 28, 2017, Thomas again came to the Clinic for monitoring. His anticoagulation level remained elevated. This time he reported his mouth was sore causing an inability to eat and continued weight loss. He made no reference to swelling or lumps in his neck, jaw, throat or difficulty swallowing to Dr. Egan. He indicated he had scheduled a dental appointment in two weeks, although this was not corroborated by any records at trial. Dr. Egan recorded that he was reluctant to go to the lab that day and refused a return appointment earlier than three weeks out. Consequently, he was scheduled for a return visit to the Clinic on August 18, 2017.

On July 28, 2017, Thomas also presented at the HTN clinic for the scheduled appointment to check his blood pressure. Thomas was seen by a registered nurse (RN) in the HTN clinic and Thomas expressed concerns about his weight loss and inability to eat. Thomas told the RN that although still smoking cigarettes, he was coughing/spitting/choking when he eats and that he felt his tongue and the right side of his neck were swollen. The nurse examined his tongue and found it within normal limits, although the RN noted he had no baseline for comparison. The RN did not record any visual abnormalities in Thomas's mouth or throat. Upon inspection of Thomas's neck the RN found "mild palpable swelling" of Thomas's right neck near the jaw. No findings were recorded of the detection of a lump or mass.

The RN placed another nutrition consult due to Thomas's acute weight loss, which Thomas again rejected. The RN also sent an alert to NP Bianco for further follow-up with Thomas. Primary Care Advanced Medical Support attempted to reach Thomas by telephone to schedule an appointment with Primary Care but was unable to contact him, getting only a busy signal and had no means to leave a message.

Thomas did not return for his August 18, 2017 Clinic appointment. Further attempts to reach Thomas by telephone were unsuccessful, and a message could not be left. Thomas had not updated his emergency contacts as previously directed, so the Clinic and Primary Care only had his deceased mother as a contact and no alternative way to reach Thomas. A letter was mailed rescheduling his Clinic appointment for August 22, 2017. Thomas did not return to the Clinic.

On August 23, 2017 the Primary Care Support again tried to contact Thomas to arrange for him to be seen. Unable to reach him and aware he had now missed two Clinic appointments Primary Care Support requested the La Mesa Police Department perform a wellness check on Thomas. Officer Alex White checked in on Thomas on August 23 and found him at home and alert. Thomas told the officer he keeps his phone

off the hook to avoid telemarketers and indicated he would go to the Clinic on August 25, 2017. Thomas did not ask for any medical assistance.

Thomas did not return to the Clinic or Primary Care on August 25. He did not contact Primary Care or the Clinic after July 28, 2017.

On August 28, 2017, Joe Beatty looked in on Thomas and found him in a weak and lethargic state. There was food in the apartment, but Thomas had not been eating and it appeared he had not even been taking in fluids in the last week. Thomas resisted Beatty's suggestion that Thomas get medical attention and Beatty called for an ambulance. Thomas was transported to the ED of the VA hospital.

Thomas was admitted to the hospital on August 28, 2017 with complaints of weakness, fatigue, significant recent weight loss and pain particularly in the neck and abdomen with difficulty swallowing. On examination, the admitting physician found Thomas's right neck tender to palpation with a palpable mass.

A CT scan of Thomas's neck revealed a six-centimeter tumor at the base of his tongue with multiple bilateral metastases to the lymph nodes in his neck. The mass was suspected to be malignant with regional spread to his lymph nodes on both sides of his neck. A biopsy was scheduled for August 30 to confirm the cancer and type but was not performed because Thomas could/would not tolerate the procedure. Thomas was clinically diagnosed with advanced metastatic oropharyngeal cancer.

By September 1, 2017 Thomas was becoming increasingly uncooperative with medical care and demonstrated a decreasing ability to make informed decisions about his treatment. Seeking to locate a responsible person to make medical decisions for Thomas, a VA social worker interviewed Joe Beatty, who observed that Thomas chooses not to take care of himself and stubbornly refuses medical care. Although Beatty got him groceries and there was food in the house, Thomas was not eating. Thomas had not been able to leave his house in the month preceding his hospitalization and spent most of the day on his couch watching television or doing word search

puzzles. Stating it had been a huge effort to get Thomas to come to the hospital on August 28, Beatty observed that Thomas seemed to have just given up.

Beatty indicated that Thomas lived alone with no other neighbors or friends upon whom he relied. Beatty reported that Thomas was estranged from his family and wanted nothing to do with them. Thomas agreed to have Beatty make medical decisions for him. The medical team however continued to try to locate legal next of kin.

On September 3, 2017, Thomas's sister Mickey Remer was contacted by the VA doctor regarding Thomas's condition. She in turn contacted Plaintiff, who then was designated the decision maker for Thomas's care on September 5, 2017. Plaintiff had last been in telephone contact with Thomas on Father's Day, June 18, 2017, just two days after Thomas's visit to Primary Care. Plaintiff testified that his father had mentioned his weight loss at that time but minimized the situation and did not indicate he had any serious health concerns.

Plaintiff consented to a biopsy under general anesthesia and traveled to San Diego on September 10, 2017. The biopsy procedure scheduled for September 18, was ultimately cancelled on the recommendation of the anesthesiologist due to high risks involved in intubating Thomas for the procedure.

After consultation with the medical staff, Plaintiff agreed to hospice care for his father. Thomas's cancer was advanced. Thomas was unable to eat, he pulled out his nasogastric tube, and was not a candidate for a gastrostomy feeding tube due to high risk of bleeding. Plaintiff arranged for his father to be transferred to hospice care and returned to North Carolina on September 19, 2017. Thomas was admitted to the palliative ward for end of life care on September 22, 2017 and passed away on September 25, 2017.

### IV. Legal Standards

Plaintiff alleges that NP Bianco was negligent in her care of Thomas, by failing to timely diagnosis and treat Thomas's cancer resulting in his premature death. Liability is determined in accordance with the law of the state where the alleged negligence occurred. 28 U.S.C. §1346 (b)(1); *Toomer v. United States*, 615 F.3d 1233, 1239 (9th Cir. 2010). Under California law, to establish a claim for medical negligence, "plaintiff must prove all the following elements by a preponderance of the evidence: (1) the duty of the professional to use such skill, prudence, and diligence as other members of [her] profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damages resulting from the professional's negligence." *Hanson v. Grode,* 76 Cal. App. 4th 601, 90 Cal. Rptr. 2d 396, 400 (1999); California Civil Jury Instructions ("CACI") Nos. 400, 500.

A primary care nurse practitioner is negligent if she fails to use the level of skill, knowledge and care in diagnosis and treatment that another reasonably careful primary care nurse practitioner would use in the same or similar circumstances. This level of skill, knowledge, and care is sometimes referred to as the standard of care. CACI No. 501.

"Because the standard of care in a medical malpractice case is a matter peculiarly within the knowledge of experts, expert testimony is required to prove or disprove that the defendant performed in accordance with the standard of care unless the negligence is obvious to a layperson." *Johnson v. Superior Court*, 143 Cal. App. 4th 297, 305 (2006) (internal quotation marks and citation omitted).

"The existing standard does not fault a medical professional for choosing among different methods that have been approved by the profession even if the choice later turns out to have been the wrong selection or not favored by other member of the profession." *N.N.V. v. Am. Assn. of Blood Banks*, 75 Cal. App. 4th 1358, 89 Cal. Rptr.

2d 885, 903 (1999); CACI 505. "A difference of medical opinion concerning the desirability of one particular medical procedure over another does not, however, establish that the determination to use one of the procedures was negligent." *Clemens v. Regents of Univ. of California*, 8 Cal. App. 3d 1, 13 (1970).

"Mere error of judgment, in the absence of a want of reasonable care and skill in the application of [her] medical learning to the case presented, will not render a [medical professional] responsible for untoward consequences in the treatment of [her] patient." *Huffman v. Lindquist,* 37 Cal.2d 465, 234 P.2d 234, 40 (1951) (internal citations omitted). "After a medical condition has been discovered it may be relatively easy to look back and identify a diagnostic procedure which would have revealed the condition but which was not medically indicated at the time. But in treating a patient a physician can consider only what is known at the time he or she acts." *Vandi v. Permanente Med. Grp., Inc.*, 7 Cal. App. 4th 1064, 1070 (1992).

"Moreover, in a medical malpractice action, causation must be proven to a reasonable medical *probability*, rather than a reasonable medical *possibility*, based upon competent expert testimony." *Wright v. United States*, No. 314CV00822GPCBLM, 2017 WL 3021156, at *9 (S.D. Cal. July 17, 2017) (*emphasis* in original) (citing *Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396, 403 (1985)). It is well established "that causation in actions arising from medical negligence must be proven within a reasonable medical probability based on competent expert testimony, i.e., something more than a '50-50 possibility.' It follows that California does not recognize a cause of action for wrongful death based on medical negligence where the decedent did not have a greater than 50 percent chance of survival had the defendant properly diagnosed and treated the condition." *Bromme v. Pavitt*, 5 Cal. App. 4th 1487, 1504-05 (1992) (citations omitted).

/////

/////

## V. Discussion

### A. Plaintiff has not established NP Bianco was medically negligent in her diagnosis and treatment of Thomas.

Plaintiff offered the opinion of Nurse Practitioner Zebulon Foreman. NP Foreman opined that NP Bianco failed to meet the standard of care in her treatment of Thomas that resulted in a delayed diagnosis of his oropharyngeal cancer. Based on her review of Thomas's records, NP Foreman concludes that NP Bianco did not properly maintain a systematic follow up of Thomas's symptoms, identify his relevant risk factors for cancer, perform a comprehensive examination based on Thomas's age and history, or order appropriate preventative and diagnostic procedures based on Thomas's age, history and symptoms.

Certain assumptions made by NP Foreman in formulating her opinion were demonstrated to be erroneous at trial. NP Foreman opined that during Thomas's June 16, 2017 examination, despite several notations in prior patient records of problems with his eating, chewing, neck or jaw pain and weight loss, NP Bianco did not address either subjectively or objectively Thomas's head and neck. The record of the June 16 examination however reflects that NP Bianco asked Thomas about any head or neck changes or issues and he denied any problems or any pain that day, except sore gums that gave him difficulty eating/chewing. NP Bianco stated she visually observed Thomas's face and neck and saw no sign of swelling or redness. The patient having denied any current pain or issues with his neck, NP Bianco determined no further objective examination of his neck was indicated.

Further there were not several records of Thomas reporting difficulties eating and weight loss prior to his June 16 examination. NP Foreman opined that Thomas's previous complaint of neck pain on March 23, 2017, despite it being diagnosed and treated by the ED doctors as a resolving muscle strain resulting from a mechanical fall, was a record that should have put NP Bianco on notice of a possible cancer diagnosis. NP Forman offered no rationale (except hindsight) for why this ED record from three

months prior that makes no reference to any patient complaints regarding eating, swallowing or weight loss and includes a record of an oropharynx examination performed at the time without any remarkable result should have informed NP Bianco to suspect Thomas might have throat cancer. NP Foreman further mischaracterizes the March 23 reference regarding follow-up with Thomas's Primary Care Provider as a notice to NP Bianco to follow-up with Thomas rather than as stated, a recommendation that Thomas follow-up with NP Bianco if new symptoms appeared.

NP Forman does not address at all Thomas's records of medical visits in April and early May that have no reports of any complaints of neck or jaw pain or concerns about his weight loss.

NP Foreman opines that NP Bianco's June examination did not adequately follow up on Thomas's reported problem eating due to jaw pain recorded on May 26, 2017. Based on his significant weight loss since his March 2016 examination, she concluded that NP Bianco should have probed more deeply into Thomas's current symptoms and physically examined his neck for lumps or swelling. The record at trial demonstrated that while such an exam may have detected a mild swelling, as was noted on May 26 and subsequently on July 28, 2017, there is no factual basis for an assumption that such an examination would have detected any lump or mass that might have indicated the need for a CT scan.

NP Forman provides no basis that the standard of care required NP Bianco to disbelieve her patient's self-assessment that whatever pain he reported on May 26, 2017 was not present on June 16, 2017. Nor does she address why it constitutes a want of care that NP Bianco assessed Thomas's present complaint as a dental-related problem given his history of poor dental care, his reported chewing discomfort that made eating difficult and a reasonable inference that his sore gums could be a likely cause of the jaw pain Thomas complained of month earlier. The defendant's expert Dr. Steven Chang, a specialist in Otolaryngology Head and Neck Surgery and Director of the

Multidisciplinary Head and Neck Cancer Clinic at the Henry Ford Hospital and Medical Centers, opined that in such circumstances a dental consult was indicated and could have helped in Thomas's diagnosis had he followed the recommendation.

NP Forman also opined that NP Bianco did not take any steps to order diagnostic tests to address causes for Thomas's unexplained significant weight loss. This assumption either ignored or overlooked that NP Bianco ordered prostate and colorectal screenings for Thomas to rule out possible causes of his weight loss. She also ordered a nutrition consult for Thomas to address his dietary habits.

NP Forman opines that NP Bianco fell below the standard of care because she did not recognize on June 16 that Thomas's symptoms, specifically significant unexplained weight loss and complaints of discomfort when eating with mild swelling on the right side of his face, were likely indications of throat cancer, particularly given his long history of tobacco use. Her opinion however overlooks or incorrectly summarizes the medical records and simply rejects the alternative diagnostic plan that NP Bianco took to ascertain the causes of Thomas's symptoms.

"After a medical condition has been discovered it may be relatively easy to look back and identify a diagnostic procedure which would have revealed the condition but which was not medically indicated at the time. But in treating a patient a physician can consider only what is known at the time he or she acts." *Vandi,* 7 Cal. App. 4th at 1070. With the benefit of hindsight, NP Forman opined that the standard of care dictated that NP Bianco should have ordered a CT scan for Thomas on June 16 that would have led to a referral to an Ear, Nose and Throat Specialist and therefore an earlier diagnosis of his oropharyngeal cancer. She has not demonstrated however that based on the information available to NP Bianco at the time she treated Thomas, her treatment decisions fell below the standard of care.

The Plaintiff has not met his burden to establish that NP Bianco breached the standard of care in her diagnosis and treatment of Thomas.

**B. Plaintiff has not established that the delay in diagnosis was a substantial factor in causing Thomas to die prematurely.**

Having found that Plaintiff did not meet his burden to establish a breach of the standard of care by NP Bianco, the Court is not required to address the issue of causation. However, even if the breach had been established, the Plaintiff has not demonstrated that Thomas had greater than 50 percent chance of survival had he been diagnosed and started treatment for his oropharyngeal cancer in June of 2017 instead of August. *See Bromme*, 5 Cal. App. 4th at 1504-05.

Both Plaintiff's expert Dr. Phillip Jay Baron, a radiation oncologist and defendant's expert Dr. Chang agreed that Thomas's cancer was treatable with a concurrent therapy of focused radiation and chemotherapy to boost the effectiveness. Both doctors also agreed that by the time Thomas was diagnosed in late August of 2017, his physical condition and mental capacity to participate in the treatment had deteriorated such that it was not feasible.

The doctors further agreed that in mid-June 2017, Thomas's cancer had already regionally spread to his lymph nodes and was clinically stage 3 or 4. While treatable, Dr. Baron assessed the likelihood of Thomas surviving 2 years at a low of 62%, and his three-year survival rate at a low of 46%. Dr. Baron's opinion focused mostly on Thomas's capacity to understand and participate in his care as of June, which he concluded was adequate at that time to give Thomas an overall better than 50% chance of survival for at least two years.

Dr. Chang, however, opined that a patient with stage 3-4 oropharyngeal cancer even in the ideal setting with the best performance status at the time of diagnosis and the best treatment delivered would have a cancer survival rate of 50%. He then estimated Thomas's survival rate had he been diagnosed in June would have been in the 25% to 30% range. Dr. Chang focused on Thomas's overall functional status which substantially limited his ability to comply with and tolerate the regiment of the chemoradiation therapy. Noting Thomas's history of non-compliance with medical

recommendations, his comorbidities, his social situation, and his documented uncooperative behavior in health care situations, Dr. Chang opined that even before Thomas's steep cognitive decline in August, he would not have been a good, much less ideal, candidate for the necessary treatment and his estimated survival rate was well below 50%.

The Court finds Dr. Chang's assessment to be persuasive based on the facts presented at trial and discussed *supra*.  Thomas lived alone with little social support and no ready transportation.  He voluntarily cut himself off from communication with others by keeping his phone off the hook and not providing current emergency contact information.  He regularly rejected medical recommendations for preventative and necessary health care. He was reluctant to seek medical help even when in extreme discomfort and pain.  He did not seek medical support when his condition deteriorated and was less than forthcoming about his medical complaints with both family and treatment providers.

Dr. Chang and Dr. Baron both described a treatment regimen for Thomas's cancer as exacting and demanding, with potential serious complications. Thomas's history does not support a conclusion that he would have been ideally compliant with the required procedures to obtain a successful result of better than 50% survival rate.

California does not recognize a cause of action for wrongful death based on medical negligence where the decedent did not have a greater than 50 percent chance of survival had the defendant been properly diagnosed and treated for the condition. *See Bromme*, 5 Cal. App. 4th at 1504-05.

Plaintiff has not established that the delay in diagnosis was a substantial factor in causing Thomas to die prematurely.

/////

/////

## VI. Conclusion

Having found that NP Bianco did not breach the standard of care and the Plaintiff did not establish causation, the Court does not need to reach issue of damages.

Plaintiff has failed to prove by a preponderance of the evidence a breach of the standard of care and causation. Therefore the Court renders its verdict in favor of defendant. Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated: November 30, 2020

_____
Hon. Cathy Ann Bencivengo
United States District Judge